DR. REUBEN BARRETT,

        Plaintiff,

    v.

ILLINOIS COMMUNITY COLLEGE DIST.
NO. 515, BOARD OF TRUSTEES OF
ILLINOIS COMMUNITY COLLEGE
DISTRICT NO. 515, SUSAN SOLBERG,
CHRISTA ADAM, MARIAN KELLY, MARIE
HANSEL, and DEBRA PRENDERGAST,

        Defendants.

No. 15 CV 2334

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Dr. Reuben Barrett, a biology professor at Prairie State College, brings Title VII, 42 U.S.C § 1981, and 42 U.S.C. § 1983 claims against the college, its Board of Trustees, and five employees, alleging race and gender discrimination, retaliation, and hostile work environment. Defendants move for summary judgment on Dr. Barrett's claims. For the reasons discussed below, the motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all

disputed facts in favor of the nonmoving party. *Simpkins v. DuPage Housing Auth.*, 893 F.3d 962, 965 (7th Cir. 2018).

## II.  Background

Defendant Prairie State College is governed by defendant Board of Trustees for Prairie State. [104] ¶ 5.[1] Defendant Marie Hansel[2] was the Vice President of Academic Affairs and Dean of Faculty at Prairie State, beginning in July 2013. *Id.* ¶ 8. Defendant Susan Solberg was Dean of Academic Affairs from 1998 through May 2010. *Id.* ¶¶ 6, 17. When Solberg became Dean of Liberal Arts in 2010, defendant Debra Prendergast took over as Dean of Academic Affairs. *Id.* ¶¶ 9, 17.[3] Defendant

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's responses to defendants' Local Rule 56.1 statements, [104], and defendants' responses to plaintiff's Local Rule 56.1 statements, [113], where both the asserted fact and the opposing party's response are set forth in one document. Any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record) have been disregarded. Only facts that are properly controverted will be considered disputed. I do not consider facts raised in the parties' briefs, or elsewhere in the record, that are not cited in their LR 56.1 statements.

[2] Dr. Barrett initially brought two separate lawsuits, both naming Prairie State and its board. In one lawsuit, Dr. Barrett named individual defendants Solberg, Adam, and Kelly. In the other, he named Hansel and Prendergast. About a year after these lawsuits were consolidated and the latter docket was administratively closed, Dr. Barrett filed a second amended complaint, naming only Solberg, Adam, and Kelly as individual defendants. Defendants move for summary judgment on behalf of all defendants, including Hansel and Prendergast. Because both parties treat Hansel and Prendergast as remaining defendants, I consider the claims in both the second amended complaint and those against Hansel and Prendergast in the original complaint, in which Dr. Barrett named them as defendants.

[3] The parties agree that Solberg supervised the biology program up until 2010, when Prendergast took over that role. Defendants refer to Solberg's 1998–2010 title as the Dean of Arts and Sciences and Prendergast's post-2010 title as the Dean of Business and Mathematics, perhaps because the role was given a new title. Because their titles do not

2

Christa Adam was a biology professor beginning in 2005 and was coordinator of the biology program from 2010 through 2014. *Id*. ¶ 7. Defendant Marian Kelly was a biology professor at Prairie State. *Id*. ¶ 10. Hansel, Solberg, Prendergast, Adam, and Kelly were white women. *Id*. ¶¶ 6–10; [113] ¶ 18. Plaintiff Dr. Reuben Barrett was a biology professor and had over 24 years of experience, making him the most senior member of the biology program. [104] ¶ 14. During his time at Prairie State, Dr. Barrett was never placed on probation or demoted, and his pay and benefits never decreased. *Id*. In a performance review in 2000, Solberg indicated that Dr. Barrett's performance in collegiality and contributions to the college was unacceptable. *Id*. ¶ 15. But because he received an unacceptable rating in just one category, Dr. Barrett was not subjected to a full post-tenure evaluation. *Id*.[4]

## A.  The Chair and Coordinator Positions

The biology program at Prairie State fell within the natural sciences department. *Id*. ¶ 16. There were around 30–40 full-time faculty in the natural sciences department and four biology labs. *Id*. The Dean of Academic Affairs (first Solberg and then Prendergast) supervised the biology program and reported to the vice president. *Id*. ¶ 17. Each academic program, including biology, had a coordinator. *Id*. ¶ 18. Coordinator positions were in part administrative and included duties like interviewing adjunct faculty and helping process lab supply orders. *Id*. There were

---

matter for this case, for simplicity, I refer to the dean that supervised the biology program as the Dean of Academic Affairs or simply the dean.

[4] Dr. Barrett asserts that he lacks knowledge as to this assertion. Because that does not properly controvert defendants' assertion, I treat the asserted fact as true.

no requirements or qualifications to be a coordinator. [104] ¶ 18. In exchange for taking on additional administrative duties, the coordinator received release time, meaning she could teach fewer credit hours without taking a pay cut. *Id*.[5] The amount of release time allotted depended on the time commitment of the coordinator position. *Id*. For example, if a coordinator's responsibilities took the same time as one three-hour course, she would teach one fewer three-hour course each semester she served as coordinator. *Id*. The dean appointed the coordinator, and the vice president approved that decision. *Id*. ¶ 19. The parties dispute how the coordinator selection process worked. Defendants assert that because coordinator was not a sought-after position, the professors in a program typically discussed who would volunteer internally and then passed that on to the dean. *See id*. Dr. Barrett asserts that the decision was up to "the unfettered discretion of the dean. [A professor had] no role in it whatsoever." *See* [86-12] at 228:17–22. Coordinators did not have any formal authority over other faculty members, though in practice, deans instructed faculty to bring things to the coordinator's attention before going to the dean. [104] ¶ 20; [113] ¶ 3; [86-7] at 398:9–12. Coordinators also signed off on lab purchase requests, *see* [104] ¶¶ 20, 23; [103-3], and lab managers reported to the coordinator as well as the dean. [113] ¶ 6.

---

[5] Some of the testimony on this point is convoluted because Dr. Barrett occasionally refers to a coordinator getting paid more. *See, e.g.*, [86-7] at 435:9–16. But viewing these statements in context and along with Dr. Barrett's testimony as a whole, it is clear a coordinator received credit hours, not additional compensation. *See* [86-7] at 441:4–10.

Both Dr. Nicholas Halm-Lutterhodt, an African-American professor in the biology program, and Craig Nelson, another male biology professor, served as coordinators. [104] ¶ 40.[6] Though Dr. Barrett acknowledged there were no qualifications to be coordinator, he believed he was more qualified than other faculty because he was the most senior, understood college governance, and had written a course. *Id*. ¶ 41. The parties dispute the extent to which Dr. Barrett expressed interest in the coordinator position. *See id*. ¶ 42. Defendants assert that Dr. Barrett had not told anyone he wanted the position since the 1990's, that he never told Solberg, Prendergast, or Hansel, and that he told Dr. Halm-Lutterhodt that if asked to be coordinator, he would turn it down. [86-8] at 17:23–19:11. Dr. Barrett does not dispute that he never told Solberg, Prendergast, or Hansel he wanted to be coordinator, but asserts that up until he filed his first EEOC complaint he consistently complained to Adam, Thurman, Halm-Lutterhodt, Kouba, and Ladaris that he had not been appointed. [86-12] at 236:7–20. Dr. Barrett also claims that Halm-Lutterhodt and Kelly told him that the administration (including Solberg, Prendergast, and Hansel) did not want him to be coordinator. *Id*. at 238:15–239:7.

While each program (such as biology) had a coordinator, each department (e.g. natural sciences) had a chair. [113] ¶ 3; [86-12] at 262:6–11.[7] Unlike coordinators,

---

[6] Dr. Barrett admits these facts but adds that Dr. Halm-Lutterhodt is African and that the administration appointed Craig Nelson after Dr. Barrett complained of discrimination in 2014. *See* [104] ¶ 40. Dr. Barrett does not cite anything in the record in support of these assertions, and so I disregard them.

[7] Though the parties agree about this distinction between departments and programs they frequently refer to biology as a department. For consistency, I call it a program.

department chairs were selected by their peers, though a faculty member could nominate himself for consideration. [104] ¶ 21. Chairs were thought of as a "think tank for the deans to get faculty input into a variety of things," and if an individual in a department had a problem, he was supposed to raise it with the chair before going to the dean. *Id*.; [113] ¶¶ 3–4. Chairs met with the dean and the vice president for monthly discussions. [104] ¶ 21. One of the perks of being chair was getting to know the vice president and gaining credibility with her. [113] ¶ 5. Like coordinators, department chairs received release time in exchange for the additional work that came with the chair position. [104] ¶ 21.

## B.    Lab Supplies and Reimbursements

Many biology courses at Prairie State had lab components. *Id*. ¶ 22. To get lab materials and to have the lab set up for class, professors used a request process that changed over the years. *Id*. Most recently, professors used Microsoft Outlook to send meeting requests to the lab manager with the date of the lab, the materials needed, and instructions. *Id*. Knowing the exact lab date was especially important when a professor requested live specimens. *Id*. The biology program ran about 160 labs per week. *Id*. The dean received the supply request list for the entire department and the list did not indicate which professor made which requests. *Id*. ¶ 23. If the price of the requested materials exceeded a certain threshold, the university required a bidding process, which could create approval problems. *Id*. Technology requests were handled differently because they were funded through a different budget. *Id*.

Dr. Barrett often did not receive requested lab supplies and equipment for his classes. *Id*. ¶¶ 24, 35. For example, he received elodea (a plant) only one or two times in recent years, and when he did not get live specimens it interfered with his teaching. *Id*. ¶ 24; [113] ¶ 9. Some of Dr. Barrett's specimens and models were not replaced, and on certain occasions, someone threw out student experiments and other materials left in the lab. [104] ¶¶ 24, 35. When Dr. Barrett's supplies were unavailable, he improvised by giving students worksheets or making up different lessons. *Id*. ¶ 25. Other biology professors took similar approaches when they did not receive materials or when the lab was not set up properly. *Id*. Though other professors occasionally dealt with these problems, Dr. Barrett consistently complained about not receiving supplies. [113] ¶ 10. Based on his observations and statements from lab managers, Dr. Barrett believed that white, female professors got the supplies they requested. [104] ¶ 39. Despite these mishaps, Dr. Barrett received positive evaluations from his deans and positive feedback from students. *Id*. ¶ 25.

Ladaris Martin set up Dr. Barrett's biology labs, and Dr. Barrett told her that he did the same labs every semester and to keep things in stock. [113] ¶¶ 7–8. One day, Dr. Barrett spoke with Martin in the cafeteria about his elodea not being alive. *Id*. ¶ 25. Martin responded that they were doing their best to ensure it was, to which Dr. Barrett told her not to worry because if it was not, he would file again (which Martin took to mean that he would file another EEOC complaint).[8] *Id*.; [86-15] at

---

[8] Neither party addresses when, precisely, Dr. Barrett filed his EEOC complaints in their LR.56.1 statement of facts.

111:17–112:1. Martin complained about this interaction to Prendergast in an email stating, "I think Dr. Barrett feels that he will get his way if he creates a hostile work environment and continues to threaten or attack those around him that do not conform to his way. I do not agree with this approach and I also feel that we should not have to tiptoe and/or walk on eggshells in order to create a peaceful or happy environment." *Id.* Martin told Prendergast she had ordered the elodea for Dr. Barrett, and Prendergast apologized and reassured Martin. [113] ¶ 25; [86-15] at 112:7–15. After learning about this incident, David Cronan (the executive director of H.R.), the deans, and the vice president determined that this was an internal issue between two employees, not a matter of discrimination. [113] ¶ 35. Had Cronan thought an investigation was necessary, he would have done more. *Id.*; [86-5] at 57:2–8. But Cronan did not think administrative procedures required a meeting, and he did not file any sort of report. [113] ¶¶ 35–36; [86-5] at 55:6–15, 57:9–12. Cronan told Martin he would speak with Dr. Barrett to make sure he did not approach her in that manner in the future. [113] ¶ 26.[9]

When Dr. Barrett complained about not receiving his lab supplies, Solberg asked staff to evaluate the lab manager John Schmidt's performance. [104] ¶ 26. Prairie State addressed different issues with its lab managers (including Schmidt and Martin) over time, including problems related to live specimens, setting up labs, and appearing for work. *Id.* ¶¶ 26, 27. Dr. Barrett was never denied lab supplies

---

[9] Defendants object to this statement as hearsay. But Cronan was an employee of Prairie State and made this statement within the scope of his employment. Fed. R. Evid. 801(d)(2)(D).

because of budgetary problems. [113] ¶¶ 21–23.[10] Prairie State was aware that Dr. Barrett believed the problems with him getting supplies were ongoing. *Id*. ¶ 37. Cronan thought the problems had been addressed, noting that Dr. Barrett still had complaints, but that Prairie State had "taken efforts to make every change that [it] could possibly make" to satisfy his concerns. *Id*. ¶ 39. Cronan agreed that it is not enough for the school to limit or restrict discriminatory conduct, it must stop the problem altogether. *Id*. ¶ 40.

In 2014, a cabinet where Dr. Barrett and other professors stored some of their lab materials was locked, and Dr. Barrett did not have access to a key. [104] ¶ 29. Once notified of the situation, Prendergast contacted the appropriate department and provided Dr. Barrett with a key within a few weeks (the parties dispute precisely how long it took). *Id*. Prairie State claimed that it was always reluctant to give out additional keys. *Id*. Dr. Barrett asserts that Adam and Prendergast had keys and he did not. *Id*. Dr. Barrett filed his first EEOC complaint about this incident. *Id*. Prairie State determined there was insufficient evidence to conclude that discriminatory animus was involved. [113] ¶ 36.

Prairie State refused to reimburse Dr. Barrett for professional development expenses. [104] ¶ 37. Prairie State reimbursed Dr. Halm-Lutterodt for a trip to Canada and sent other black male faculty to a training in Florida, though it did not

---

[10] Defendants object to this assertion, arguing that Martin, as a lab manager, does not have the requisite knowledge to know whether budgetary constraints impacted providing Dr. Barrett with his lab materials. But it is reasonable to infer that, given Martin's role in keeping supplies in stock, she would have been aware if the college's budget affected Dr. Barrett's supplies.

send Dr. Barrett to that training. *Id*.[11] After Solberg denied Dr. Barrett's request for reimbursement for supplies he purchased, he stopped submitting reimbursement requests. [104] ¶ 28. During his time at Prairie State, Dr. Barrett bought over $100,000 in materials for his courses. *Id*.[12] In 2002, Dr. Barrett submitted a travel request form. *Id*. ¶ 51. Linda Uzureau (the Vice President of Academic Affairs at the time, *see id*. ¶ 11) attached a Post-it note to the form, stating "Susan—Please tell Reuben that we would like to get these at least a week before the event!". *Id*. ¶ 57.

### C.    Conflicts with Other Employees

Dr. Barrett and another professor developed the curriculum, outline, materials, and lab schedule for Biology 100, all of which corresponded with a certain textbook. [104] ¶ 30. Prairie State submitted courses to the Illinois Articulation Initiative for approval so that students could transfer the credits they earned at Prairie State to other schools. [113] ¶ 24; [86-9] at 39:14–40:18. Some biology professors wanted to standardize the labs to obviate the need for lab requests and make things easier on the lab managers. [104] ¶ 31. When Dr. Barrett objected, the department decided not to go through with the standardization. *Id*. ¶ 33. Biology faculty also considered using different books for Biology 100; it was typical for

---

[11] Defendants assert that Prairie State did not send Dr. Barrett to this training because people at the college did not realize Dr. Barrett was black. Dr. Barrett disputes this portion of defendant's assertion, but it is consistent with his own statements from the record. *See* [86-16] at 11 (noting that Dr. Barrett was "[i]gnored as a black faculty as the admin sent all black males to Florida for training for the protégé program" and that a staff administrator "had to tell [those in charge] in an admin meeting that [Dr. Barrett] was black … after the fact").

[12] Dr. Barrett does not have receipts for these purchases, but he has the materials, which he stores in his home. [104] ¶ 28.

professors to evaluate course textbooks regularly to make sure they were using the best book available for their courses. *Id.* ¶ 32. When the biology program switched to a different textbook, Dr. Barrett's students complained that the chapters listed with his online notes no longer corresponded to the chapters in the textbook. *Id.* ¶ 33. The parties dispute whether Dr. Barrett could have kept using his preferred course materials. Dr. Barrett says his book was pulled from the bookstore, and so was no longer available to his students. *See* [86-12] at 19:13–16.

In addition, Dr. Barrett had to defend his work to his colleagues, meaning he had to explain what he was doing in his courses and why he needed certain supplies. [104] ¶ 36.[13] People at Prairie State did not address Dr. Barrett with the title "doctor." *Id.* ¶ 38. They did, however, address Dr. Halm-Lutterodt with the title, calling him Dr. Nick. *Id.* According to Cronan, professors and other employees at Prairie State often referred to professors by their first names, regardless of whether the professor was also an accredited physician.[14] [113] ¶ 41;[15] [86-20] at 411:4–19. In November 2014, while Solberg was dean, she emailed Dr. Barrett asking him to allow one of his students to take her exam early. [104] ¶ 52. Dr. Barrett felt the email was hostile because it was outside the scope of Solberg's job. *Id.*

---

[13] When asked whether other faculty members had to defend their work, Dr. Barrett gave inconsistent answers, first saying he had no idea and then claiming he was the only one having to defend his work via email, but that Thurman Wilson, an African-American man, had experienced similar problems in the past. *Compare* [86-7] at 421:8–11, with *id.* at 443:10–20. Dr. Barrett also said that Halm-Lutterhodt experienced similar issues. *Id.* at 443:20–25.

[14] Though neither party asserts so in its statements of fact, Dr. Barrett is also a chiropractor.

[15] Dr. Barrett exceeds the 40-paragraph limit set forth in Local Rule 56.1. Despite this noncompliance, I consider the additional facts he asserts if they otherwise comply with the local rule.

In 2016, another professor, Lee Anne Burrough, called Dr. Barrett a troublemaker on two separate occasions. [104] ¶ 49; [113] ¶ 42. Dr. Barrett reported this to Human Resources, which opened an investigation. [104] ¶¶ 12, 49. When investigating a complaint, Cronan usually spoke with complaining witnesses first, but he spoke with Burrough before Dr. Barrett because of scheduling issues, and he did not think this impacted his investigation. [113] ¶ 44. Cronan issued a report, crediting Burrough's account of the events and concluding there was no evidence of gender-motivated harassment. [104] ¶ 49. Cronan noted in his report that Burrough had vehemently denied calling Dr. Barrett a troublemaker and looking at him with a menacing look. [113] ¶ 45. Cronan was struck by the manner in which Burrough responded to his inquiry. *Id*. During the investigation, Cronan viewed a security videotape of the incident, but the camera was positioned far away from where the incident had taken place. *Id*. Though the footage showed both Burrough and Dr. Barrett near Dr. Barrett's classroom at the relevant time, Cronan was unable to tell whose precise version of the events was accurate. *Id*. Cronan acknowledged that the video corroborated some of the facts Dr. Barrett asserted, but he concluded it was more likely that the incident was a light-hearted greeting of a colleague than intentional harassment and that the incident did not violate Prairie State's policy that employees treat coworkers and students with respect, courtesy, and professionalism. [113] ¶¶ 43–44, 47. Cronan also believed Burrough when she said she had not heard of Dr. Barrett's lawsuits or EEOC charges, and he did not inquire further. *Id*. ¶ 46. Cronan admitted his conclusions were based on speculation. *Id*.

¶ 47. He offered Dr. Barrett a meeting with college officials and participation in employee assistance program and counseled him to avoid any retaliation against Burrough. [104] ¶ 49.[16]

Whenever a Prairie State employee filed a written complaint alleging harassment, Lynita Gephardt, the Executive Director of H.R. at Prairie State before Cronan took over in 2012, expected to be aware of it so she could investigate. [113] ¶¶ 27–29, 31. When investigating a complaint, Gephardt asked for the complete story and interviewed the accused as well as any witnesses. *Id.* ¶ 31. According to Gephardt, it would not be an appropriate response, in a he-said she-said situation, to recommend counseling to the accused and instruct the complainant not to take any other conduct or make any further accusations. *Id.* ¶ 33.[17] Gebhardt never recommended counseling for an accusing party. *Id.* ¶ 32. If Dr. Barrett reported discrimination or unequal treatment, Gephardt expected that the vice president or dean would have reported it to her. *Id.* ¶ 30. Nobody reported any allegations from Dr. Barrett to Gephardt. *Id.*

Cronan reviewed all three of Dr. Barrett's EEOC charges, and Prendergast, Hansel, and the president of the college were all aware of them. *Id.* ¶ 34. Cronan began reviewing the materials Dr. Barrett had submitted to the EEOC but stopped

[16] Dr. Barrett purports to deny parts of [104] ¶ 49, but it is not clear what exactly he disputes. He cites to his own assertions of fact, [113] ¶¶ 41–47, but those assertions do not directly controvert any of defendants' assertions.

[17] Defendants object, arguing that the hypothetical posed to Gebhardt did not accurately reflect the situation with Dr. Barrett and based on foundation. Whether applicable to Dr. Barrett or not, the assertion accurately reflects Gephardt's deposition testimony. *See* [86-19] at 74:1–14.

because "they were so dense and so filled with biologic arcane—arcanity, that I—I had to go to the individuals, the dean and VP to even understand what [Dr. Barrett] was trying to say in those documents." *Id.* Cronan had a master's degree and a law degree. *Id.*[18]

## D. Evidence of Racial Animus

Dr. Barrett marshaled evidence of different incidents, occurring at discrete moments over a long period of time and involving different people, that touch on racial animus.

Several people at Prairie State used the N word. [104] ¶ 50. Around the time President Obama was elected in 2008, Martin discovered an email on Schmidt's computer with a picture of a black man being lynched. *Id.* ¶ 53. Another professor, Mike Maddox, came into Dr. Barrett's office around the same time and said, "nobody wants an N for president." *Id.* ¶ 55. Dr. Barrett reported Maddox's statement, and the president of Prairie State met with him to discuss it. *Id.* Maddox also hit Dr. Barrett in the head with a water bottle in mid-2009. *Id.* The college investigated and issued a memo indicating that Maddox had violated college policies and that that would be reflected in his personnel records. *Id.* Maddox frequently caused trouble at Prairie State. [113] ¶ 15.

---

[18] I largely disregard defendants asserted facts [104] ¶ 43 and ¶ 46. Whether Dr. Barrett precisely articulated all the conduct giving rise to his claims at his deposition does not limit his claims at summary judgment. I consider all the material facts asserted by both parties for each of Dr. Barrett's claims.

In 1995, Dr. Barrett overheard Kelly in the cafeteria saying she liked her men like she liked her coffee, black. [104] ¶ 54. Kelly sometimes ate Martin's food, took her office supplies, and was generally disrespectful. [113] ¶¶ 19–20. At the time, Martin thought it could have been because of her race (Martin is African American). *See* [86-15] at 234:15–18, 269:1–12. But Martin also noted that Kelly did this to everyone, and that as time went on, Martin realized that was just how Kelly was. *Id*. Kelly taught in her class (at an unspecified time) that black people were inferior white people because their brains were smaller. [104] ¶ 50.

Solberg responded to another professor's mention of racism, saying "racism is alive and well at Prairie State College." *Id*. ¶ 43. Don Kouba, a former instructor and coordinator of the photographic studies program, thought that Solberg displayed favoritism, particularly when scheduling courses. [113] ¶ 11. As an example, when Kouba had an issue with another teacher, Solberg was not open to hearing both sides of the story, noting she "had it on reliable source" what happened. *Id*. ¶¶ 2, 11–12.[19]

## III.  Analysis

Dr. Barrett brings sex and race discrimination, hostile work environment, and retaliation claims against Prairie State, its board, and the individual defendants under 42 U.S.C. §§ 1981 & 1983. Section § 1981 gives "[a]ll persons within the jurisdiction of the United States" the same right "to make and enforce contracts … as

---

[19] Defendants object to this statement as hearsay. But it qualifies as a nonhearsay admission of a party opponent. Fed. R. Evid. 801(d)(2)(D). Though Kouba has the requisite personal knowledge to testify about his own interaction with Solberg, Dr. Barrett also asserts, relying on Kouba's testimony, that for over ten years Maddox consistently told Solberg things that weren't true, and Solberg did nothing to try to figure out the truth. *See* [113] ¶ 16. This statement lacks the necessary foundation and I disregard it.

is enjoyed by white citizens." 42 U.S.C. § 1981(a). Dr. Barrett also brings Title VII claims against Prairie State and the board. "[T]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims." *Williams v. Seniff*, 342 F.3d 774, 788 n. 13 (7th Cir. 2003).

## A. Timeliness

Dr. Barrett does not address defendants' argument that some of the conduct at issue is untimely, noting only that time-barred allegations may still serve as background evidence to support his claims. *See* [103] at 19 n. 2. The statute of limitations for Dr. Barrett's constitutional claim is four years. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004). When a state actor violates § 1981, the sole remedy for that violation is under § 1983. *See Campbell v. Forest Preserve Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014). And although the statute of limitations for § 1983 claims in Illinois is two years, when such a claim is brought pursuant to the substantive rights created by § 1981, the § 1981 four-year statute of limitations applies. *See Sams v. City of Chi.*, 13-cv-7625, 2014 WL 6685809, at *6 (N.D. Ill. Nov. 25, 2014). Dr. Barrett filed this lawsuit on March 18, 2015, meaning only events occurring after that date in 2011 are within the statute of limitations for Dr. Barrett's constitutional claims. For the Title VII claims, a plaintiff must file a complaint with the EEOC within 300 days of the complained of conduct. 42 U.S.C. § 2000e–5(e)(1). Dr. Barrett filed his first EEOC complaint on April 4, 2014, meaning only conduct occurring after June 8, 2013 potentially falls within the statute of limitations for Dr. Barrett's Title VII claims. That said, for a hostile-work-

environment claim, if the alleged conduct forms a single unlawful employment practice, part of which falls within the statutory period, a court may consider conduct outside of the statute of limitations. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017).

### B. Discrimination

To prevail on a discrimination claim, a plaintiff must show (1) he is a member of a protected class, (2) he was subject to an adverse employment action or a hostile work environment, and (3) the employer took that action because of plaintiff's protected characteristic. *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019). Not everything that makes an employee unhappy gives rise to a discrimination claim. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). "A materially adverse employment action is something 'more destructive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)). Materially adverse employment actions generally fall into one of three categories: (1) those affecting an employee's finances (including a demotion or termination), (2) actions involving a change in an employee's career prospects by preventing him from using his skills, and (3) those where the conditions of employment change to subject the employee to humiliating, degrading, or unsafe conditions. *Nichols*, 510 F.3d at 780. Denial of a promotion constitutes a materially adverse action if "the position for which a plaintiff was

rejected offered markedly greater compensation, responsibilities, or title." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016).

Dr. Barrett argues that both the coordinator and chair positions are promotions, and that the biology program's failures to appoint and elect him to those positions were materially adverse actions. Neither position came with additional compensation. Instead, coordinators and chairs taught fewer classes in exchange for taking on additional administrative duties. Defendants argue that faculty members generally do not want to serve as coordinator because it requires additional work without any added benefits. Though the coordinator does not have any formal authority over his colleagues, viewing the facts in the light most favorable to Dr. Barrett, the coordinator position comes with additional authority. Other professors first go to the coordinator when they have a problem, and the coordinator signs off on purchase requests before passing them up the ladder. Because the coordinator position comes with greater responsibilities, the refusal to appoint Dr. Barrett could have impacted his career prospects, and therefore constitutes a materially adverse employment action. The same is true for the chair position. The chair position comes with additional administrative duties and direct interaction with other administrators, including the dean. While neither position is a clear-cut promotion, a reasonable jury could conclude that the college's refusals to appoint or elect Dr. Barrett to these positions were materially adverse employment actions.

When evaluating a discrimination claim, the relevant question is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's

protected characteristic motivated the adverse employment action. *Ortiz v. Werner Ents., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). No reasonable juror could conclude that these promotion decisions were motivated by plaintiff's race or sex. As for the coordinator position, Dr. Barrett does not assert that he ever told either Solberg or Prendergast—who according to him were the sole decisionmakers—that he wanted to be coordinator. *See Riley*, 829 F.3d at 892 (Noting that to state a prima-facie failure-to-promote claim a plaintiff must show that he applied for and was rejected from the position). Dr. Barrett asserts that doing so would have been futile because the dean alone decided who to appoint, without input from professors. But he also does not point to any specific promotions he missed out on, instead objecting to the fact he was never chosen. He does not address whether or when the biology program was looking for a new coordinator. Without any of these details, a reasonable juror could not pinpoint anything about the Solberg's or Prendergast's motivations not to appoint Dr. Barrett, let alone conclude that they were motivated by his race or sex. Moreover, aside from Solberg's comment that racism was alive and well at Prairie State, there is no evidence linking these decisions to Dr. Barrett's protected characteristics. And Solberg's observation that racism existed does not support an inference that she acted with racial animus when deciding not to appoint Dr. Barrett coordinator. There is nothing linking this decision to Dr. Barrett's sex. Given the lack of evidence of race or sex-based motivations, no reasonable juror could conclude Dr. Barrett was not appointed to the coordinator position because of either protected characteristic. At summary judgment, a plaintiff must make a "showing sufficient to

establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Dr. Barrett has failed to do so.

The same is true for the chair position. Dr. Barrett does not provide any details about the election process, does not assert when the elections took place, or what their outcomes were. He also does not claim that he nominated himself for the position or that he was ever in the running for an election. Instead, he merely asserts that because he was never elected, it must be because of his protected characteristics. This is not enough. The natural sciences department is made up of 30–40 faculty members, all of whom, presumably, vote to elect the department chair. Assuming that Maddox is part of the natural sciences department, there is evidence that two of those voting—Maddox and Kelly—had racial animus.[20] Maddox's and Kelly's racial comments and actions occurred many years outside the scope of plaintiff's complaint. But even considering them, there is nothing to show that the animus of two individuals could have dictated the outcome of an election—especially given that Dr. Barrett never nominated himself for consideration. And there is nothing linking the decision not to elect Dr. Barrett to the chair position to his sex. No reasonable juror could conclude that Dr. Barrett was not elected chair because of his protected characteristics.

None of the other acts Dr. Barrett points to, on their own, rise to the level of a materially adverse employment action. Failing to provide Dr. Barrett with lab

---

[20] There is nothing to suggest that lab managers voted in these elections, so Schmidt's racial animus is unlikely to have affected the outcome.

supplies and a key to the cabinet where some supplies were stored, changing the course textbook, requiring him to defend his work, and refusing to call him doctor all changed the conditions of employment, but none of this conduct on its own is sufficiently humiliating, degrading, or unsafe to give rise to a discrimination claim. Though it may have been inconvenient to Dr. Barrett to have to update his materials to correspond to the new course textbook and to adapt his labs when he did not receive adequate supplies, inconvenience is not enough to give rise to a claim. *See Rhodes*, 359 F.3d at 504; *see also O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004) (holding that the loss of perks such as a cell phone, pager, vehicle, parking space, and weekends off was not materially adverse). Similarly, Dr. Barrett having to defend his work and other professors refusing to call him doctor are potentially degrading actions, but not so severe as to give rise to a claim. *See Longstreet v. Ill. Dept. of Corrections*, 276 F.3d 379, 384 (7th Cri. 2002) (concluding that requiring an employee to substantiate that her absences were illness related was not an adverse action); *see also Nichols*, 510 F.3d at 780 (holding that reassignment to a boring and more repetitive job was not materially adverse). There is also insufficient evidence from which a jury could conclude these actions were motivated by his race or sex. Dr. Barrett claims that white female employees did not have to similarly defend their work, but this is speculation; he provides no evidence to support it. He does not assert that white female professors were addressed as doctor; and people referred to Halm-Lutterhodt as Dr. Nick, undercutting an inference that any refusal to address Dr. Barrett with his title was linked to his race or sex.

Denying Dr. Barrett's reimbursement requests had financial consequences, but Dr. Barrett acknowledges he did not submit reimbursement requests for most of the supplies he purchased, so there is no way his loss was caused by defendants' discrimination. There is not enough detail about what training opportunities Dr. Barrett claims to have missed out on to conclude that this conduct was materially adverse. And Dr. Barrett has the burden to put forth enough facts to support all elements of his claims. Even assuming the lack of training affected Dr. Barrett's career prospects, there is no indication that these refusals were linked to his protected characteristics. In fact, the only training opportunity Dr. Barrett missed out on that is described with any detail was meant for black men, which undermines any potential link to his race or sex. The post-it note attached to Dr. Barrett's reimbursement request does not demonstrate any animus, let alone animus based on race or sex. Even if Dr. Barrett turned his requests in on time, a note asking that he be timely is not evidence of hostility or linked to his protected characteristics. No reasonable jury could conclude that Prairie State or its board discriminated against Dr. Barrett because of his race or sex.

### B. Hostile Work Environment

In addition to alleging discrimination based on a single materially adverse action, a plaintiff can also bring a hostile-work-environment claim, alleging that different incidents together give rise to a claim. Dr. Barrett does not articulate what conduct gives rise to his hostile-work-environment claim, noting only that his "complaints and EEOC Charge documents demonstrate the daily and continuous

harassment he has dealt with for years." [103] at 9. Though some of the incidents discussed above were not materially adverse on their own, considered cumulatively they could constitute a hostile work environment. To prevail on a hostile-work-environment claim, a plaintiff must establish that he was subject to unwelcome harassment, that the harassment was based on his protected characteristic, that it was severe or pervasive to a degree that it altered the conditions of his employment, and that there is a basis for employer liability. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018).

A work environment need not be hellish to be actionable. *Gates*, 916 F.3d at 633. Whether certain conduct rises to the level of a hostile work environment depends on the circumstances at play, including: "the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance." *Robinson*, 894 F.3d at 828. Whether conduct is severe or pervasive enough to give rise to a claim depends, in part, on who the harasser is. *Id*. at 828–29. A supervisor's use of the N word or similar epithets, for example, may give rise to a claim even if the comments were infrequent, but the same comments from a co-worker may not be materially adverse. *See id*. Also relevant is whether the comments were made directly to the plaintiff or if the plaintiff heard them secondhand. *Id*.

"Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Id*. Considering all the conduct Dr. Barrett complains of, from not receiving lab supplies to having to defend

his work, a reasonable jury could conclude that the harassment altered the conditions of his work environment and was severe or pervasive. Though for the same reasons discussed above there is no evidence from which it could conclude that this harassment stemmed from his race or gender, some "forms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). "Evidence that a workplace is tainted by overt racial hostility can support an inference that other harassment that at first seems race-neutral also has an undercurrent of racial animus." *Id*. Viewing the facts in Dr. Barrett's favor, there is evidence of explicit racial animus at Prairie State—some individuals used the N word, Kelly and Maddox made racial comments, Kelly taught her students black people were inferior and made racial comments, and Schmidt had an email with a lynching photo.[21] The incidents with Maddox and Kelly took place around 2008 or 2009, and Kelly made her racial comment in 1995. Dr. Barrett does not provide any details about who else used the N word or when that occurred, nor does he address when Kelly taught that black people were inferior to her class. Because most, if not all the evidence of explicitly racial comments and incidents falls outside even the most generous statute of limitations, it can be considered only if it is part of a continuing violation. *See Milligan-Grimstad*, 877 F.3d

---

[21] Though Martin at one point thought Kelly's treatment of her was race-based, there is no evidence that Kelly treated Martin differently because of her race. And Martin later concluded Kelly treated everyone that way.

at 712. Dr. Barrett does not address the untimeliness of this conduct or whether it is part of a continuing violation. Given the lack of detail he provides, there is no evidence to support the conclusion that this racially motivated conduct and the other facially neutral conduct should be treated as a single employment action. *Id*. at 713 ("When determining whether gaps in the alleged conduct prevent it from forming a single employment practice, we have demanded that plaintiffs provide more than speculative, unspecific assertions.").

Even if this conduct were timely, it would not support an inference that the other harassment was also racial. In other words, there is no evidence that the facially neutral conduct Dr. Barrett points to is "sufficiently intertwined" with the discriminatory remarks to conclude animus motivated that conduct as well. *See Cole*, 838 F.3d at 896 (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001)). Aside from vague allegations that he was the only one who experienced this type of harassment, Dr. Barrett points to nothing else to show that it was motivated by his race or sex. Without some evidence of a link, no reasonable juror could conclude Dr. Barrett was subjected to harassment based on a protected characteristic.

### C.    Retaliation

The same elements apply to retaliation claims under § 1981 and Title VII. *Stephens v. Erickson*, 569 F.3d 779, 786 (2009). To prevail, a plaintiff must prove that he engaged in statutorily protected activity and suffered an adverse action because of that activity. *Alamo v. Bliss*, 864 F.3d 541, 555 (7th Cir. 2017). To satisfy the

causation requirement, a plaintiff must show that the protected conduct was a "substantial or motivating factor" in the decision to take the adverse action. *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012) (overruled on the other grounds in *Ortiz*, 834 F.3d at 764–65). For a retaliation claim, an action is materially adverse if it would dissuade a reasonable employee from engaging in the protected activity. *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 696 (7th Cir. 2017). Though the standard is different, for the same reasons discussed above, the only conduct to rise to the level of materially adverse actions are the failures to promote Dr. Barrett to coordinator or chair. The other conduct Dr. Barrett complains of would not dissuade a reasonable employee from undertaking protected activity.

In addition to Dr. Barrett's EEOC complaints, his internal complaints about unlawful employment practices qualify as protected activities. *See Northington v. H&M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013); 42 U.S.C. § 2000e–3(a). But there is no evidence of a link between that protected conduct and the refusals to promote Dr. Barrett. As evidence of a link, Dr. Barrett points to the incidents with Martin and Burrough and the way Prairie State responded to those conflicts. The incident with Burrough involved protected activity because Dr. Barrett reported what he believed was unlawful conduct. But there is no link between that occurrence and any subsequent decisions not the promote Dr. Barrett. Burrough may have been referencing Dr. Barrett's EEOC complaints when she called him a troublemaker, but her name-calling is not an adverse action giving rise to a claim. Nor was Cronan's warning to Dr. Barrett not to retaliate against Burrough or his offer that Dr. Barrett

participate in counseling. Being placed on a formal performance improvement plan is not a materially adverse action. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Nothing about the context of this situation shows that the offhand comments from Cronan advising Dr. Barrett to avoid any further conflicts should warrant a different outcome. And nothing about this incident with Burrough or Prairie State's response to it makes it any more likely that the promotion decisionmakers acted in retaliation for Dr. Barrett's protected activities. Prairie State undertook a thorough investigation before concluding that the incident did not warrant discipline. Dr. Barrett does not assert that Burrough had anything to do with appointing or electing him to coordinator or chair or that she was even affiliated with the biology program or natural sciences department.

Nor does Dr. Barrett's encounter with Martin demonstrate a connection between Dr. Barrett's complaints and the failure to promote him. This incident did not involve Dr. Barrett's protected activity—Martin reported his conduct, not vice-versa. Martin referenced Dr. Barrett's EEOC complaint (by noting that he had threatened to file another complaint against her), but nothing about Prendergast's response, or the fact that she reassured Martin, shows that she acted out of retaliation when deciding the unrelated issue of whether to appoint Dr. Barrett coordinator. Given the ongoing nature of the promotion decisions, there is no evidence of suspicious timing to support an inference that Dr. Barrett was not promoted because of his protected activity. Without some evidence of a link between the two, no reasonable juror could conclude Prairie State retaliated against Dr. Barrett.

### D.    Individual Liability

Dr. Barrett also brings § 1981 and § 1983 claims against the individual defendants—Hansel, Solberg, Prendergast, Kelly, and Adam. Individual liability is appropriate only when the "individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996). A subordinate employee with discriminatory or retaliatory motive can be individually liable under § 1981 for causing an employer's actions. *Smith*, 681 F.3d at 899 (overruled on the other grounds in *Ortiz*, 834 F.3d at 764–65). But Dr. Barrett's claims against the individual defendants fail for the same reasons as those against Prairie State. There is no evidence from which a reasonable juror could conclude that any of the individuals participated in a materially adverse action against Dr. Barrett that was motivated by his race or gender, or in retaliation for his protected activity.

## IV.    Conclusion

Defendants' motion for summary judgment, [85], is granted. The clerk shall enter judgment and terminate the case.

ENTER:

Manish S. Shah
United States District Judge

Date:  August 5, 2019